IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AGNES R. DeLEON,

      Plaintiff,

v.                                                                          CIV 08-1120 JCH/KBM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

PROPOSED FINDINGS
AND
RECOMMENDED DISPOSITION

THIS MATTER is before the Court on Plaintiff Agnes DeLeon's motion requesting that

this Court reverse the Commissioner's decision denying benefits, remand for a rehearing on all

issues, and to either order that Plaintiff's most recent prior application be reopened or order that

the Commissioner make a decision regarding reopening. *See Doc. 16* at 15.  The entire record as

well as the arguments have been carefully considered.  I recommend that insofar as the motion

seeks reversal, it be denied because there exists a deficiency in opinion writing that cannot be

resolved by the Court.  Instead, I recommend that this matter be remanded for further

proceedings concerning Plaintiff's mental impairment.

I.  Introduction

Plaintiff has a high-school education and worked primarily in clerk and restaurant

positions her entire working career.  *See, e.g., Administrative Record* ("*Record*") at 32-41, 95-96,

111-13, 125, 133, 147, 175.  There was no reported income for her from 1990 through 1999 or

for 2003, and 2006 marks the last year of reported income, which was minimal – $703.97.  *Id.* at

96, 111, 133.  She filed for, and was denied, disability benefits on at least two, and perhaps three, prior occasions.  *See id.* at 95.

The earlier prior applications and almost decade gap in employment relate to Plaintiff's representations about her employment in the kitchen of a state hospital.  For example, she has asserted that she injured her lungs while working there by inhaling fumes at some unspecified date, and injured her back and head by slipping on ice in the parking lot in 1990.  *See id.* at 95, 97, 270, 293.  Also, when she was treated for depression and anxiety sporadically in 2003 and 2004 before she discontinued treatment, she complained of "poisoning," chronic back pain and migraine headaches stemming from the slip and fall.  *See, e.g., id.* at 262, 269,  270, 274-75, 280-81, 285,  291, 293.  At the ALJ hearing in 2007, she testified that she had chronic breathing problems, back pain, and headaches from old injuries.  *See id.* at 35-36.

The application at issue here is the one she filed for Supplemental Security Income (SSI) that is dated November 1, 2005 and alleges an onset date of May 8, 2005.  *See id.* at 16, 136, 157.  She suffered two injuries in 2005 – one before and one after her asserted onset date.  On January 4, 2005, she was seen at the hospital due to a work injury when a box fell on her right elbow and an associated migraine headache.  *See id.* at 386-02.  The result of the elbow x-ray was "Negative" – "No acute fracture, dislocation, hemarthrosis, osteolytic or osteoblastic lesion seen." *Id.* at 357 (duplicated at 393).[1]  She was discharged with instructions to wrap and ice the elbow for three days and to not use her right arm for four days "[t]hen activity as tolerated."  *Id.* at 394.

---

[1]  Many documents of the cited documents have several duplicates throughout the record. Although the entire record has been meticulously reviewed, I will not hereafter refer to the duplicate numbers because there are so many.

By early February she had filed a Worker's Compensation claim for her elbow injury, and orthopaedic specialist Dr. Paul Conescu was treating her.  He gave her steroid injections and returned her to "light duty" as of February 7, 2007, and the following week clarified that this meant lifting a maximum of twenty pounds.  *See id.* at 212, 370.  In late April 2005, Plaintiff returned to Dr. Conescu complaining of pain in her right elbow and also right shoulder.  He diagnosed "right lateral epicondylitis" or "Tennis Elbow," and "subcromial bursitis" in the shoulder.  He restricted her to "sedentary" work and to not lift "more than 10 pounds."  *See id.* at 369.[2]  When she mentioned shoulder pain, Dr. Consescu advised her that she should see a neurologist because any shoulder pain was unrelated to her elbow injury and therefore "not covered under Worker's Comp."  *Id.* at 368.

After her alleged onset date, a June 2, 2005 medical record by Dr. Conescu noted that Plaintiff could have steroid injections only once every three months, that he planned to see her at the next three-month mark, and advised her that she could "continue working light duty with limited use of the right upper extremity."  *Id.* at 21.  There is no record of her ever having seen him again.

On June 8, 2005, six days after this last visit with Dr. Conescu, Plaintiff was involved in an automobile accident.  She told her internist Dr. Franklin Miller that her vehicle was hit from

---

[2] *See* http://www.medterms.com/script/main/art.asp?articlekey= 25186 ("Lateral Epicondylitis" or "Epicondylitis, lateral" – "See: Tennis elbow.").  "Tennis elbow" is defined as a "painful injury to the tendon . . . attached to the outer part of the elbow due to repetitive twisting of the wrist or forearm" and because this "tendon attaches to the lateral epicondyle of the humerus" the "condition is therefore also known as lateral epicondylitis."  http://www.medterms.com/script/main/art.asp?articlekey= 25184.

behind, and her head hit the steering wheel.  She also told him she was having problems with

sleep "depressed – off job – not suicidal," and he assessed her with "whiplash" and "depression."

*Id.* at 243.  A subsequent x-ray of her cervical spine was "Negative"  – "No acute fracture or

dislocation seen."  *Id.* at 356.  An MRI for her complaints of neck pain showed:

> There is sick desiccation and slight lost of height at the C6-C7
> level.  Mild ostephytic spurring is seen here, as well.  No abnormal
> signal is seen within the visualized cord.  No evidence of Chiari
> malformation.
>
> At C6-C7, there is a mild annular bulge without evidence of
> significant spinal stenosis with what is probably some mild right
> caudal neural foraminal narrowing.
>
> Impression:
> Degenerative changes at C6-C7 extending off to the right leading
> to mild right caudal neural foraminal narrowing.

*Id.* at 222.

While Plaintiff was pursuing a legal action for the automobile accident, she asked Dr.

Miller to refer her to orthopedist Dr. Richard Webber for her complaints of neck and right

shoulder pain and decreased strength in her right arm.  *See id.* at 238-39; 205-07.  An MRI of her

shoulder showed "evidence of degenerative changes with minimal subchondral cystic change"

and no injury to the rotator cuff or labrum.  *Id.* at 200.  An x-ray of her shoulder showed "[n]o

acute fracture, dislocation, or separation seen.  No significant degenerative changes seen in the

A-C joint.  Osseous structures appear within normal limits."  *Id.* at 221.

Plaintiff also had a nerve conduction study performed in preparation for the lawsuit, and

she thought that procedure was the cause of a painful indentation in her upper right arm.  *See,*

*e.g., id.* at 238, 200.  The results of this study are not in the record, but neurologists Dr. Mark

4

Berger and Dr. Manuel Gurule reported that Plaintiff was mistaken as to cause of the indentation, and should continue as scheduled with her prescribed physical therapy.  *See id.* at 209 (the indentation "appears to be old scarring and focal atrophy . . . not likely to have been caused by her EMG and nerve conduction studies").

Despite Dr. Miller's prescriptions for pain medication for several months,[3] Plaintiff reported to him in late October 2005 that her pain had not improved and "she want[ed] to apply for disability and wants to know what to do next."  *Id.* at 237.  Soon thereafter, Plaintiff filed the instant application and called Dr. Miller indicating that she "needs a letter . . . stating she is unable to work x 6 months in order to get financial assistance and SSI."  *Administrative Record* at 236.  That same day, Dr. Miller hand wrote on "From the Desk Of Franklin Miller, M.D." letter head:  "To Whom It May Concern:  Due to shoulder problems Ms. De Leon has been and continues to be unable to work." /s/.  *Id.* at 202.

Plaintiff's application is based on the mental impairment of "depression" as well as the physical impairments of:  "[b]ack problem/migraine headaches/dizziness/fatigue/whip blash (sic) of the neck and back/rt arm injury/nerve damage to rt arm," which rendered her unable "to work due to my injuries since I am not able to lift, do not have any strength in my arms and suffer from chronic pain."  *Id.* at 146.   In contradictory responses to the questions on the Adult Disability Report and other parts of the record, Plaintiff indicated that she first became unable to work on May 8, 2005, but that her conditions began to bother her in October 2004 and she therefore stopped working at that time.  *Id.*

_____

[3]   The prescriptions included Tylenol #3 (codeine) and hydrocodone.  *See Record* at  151, 205-06, 235, 238-43.

Benefits were initially denied in February 2006 when based solely on the alleged physical conditions. *See id.* at 74, 75, 77, 261. Shortly thereafter, Plaintiff was scheduled for a consulting examination in May 2006 that would include "psychological testing." *Doc. 16-3* at 1. The subsequent Psychiatric Review Technique form filled out by LeRoy Gabaldon indicates that Plaintiff failed to keep two scheduled appointments for that testing. *See Record* at 258. However, Plaintiff contends she received only one notice and attached it to her motion. The administrative record submitted by the Commissioner is devoid of any such notices. In any event, the reconsideration denial in July 2006 was partly based on Plaintiff's failure to "take the medical examination we asked you to have at our expense [which] was needed to fully evaluate your condition." *Id.* at 72, 73, 80.

Plaintiff's present attorney, who was appointed after the ALJ issued his decision, has submitted a letter in which Ms. DeLeon states that she went to the May 9, 2006 appointment but Dr. Micheal Gzaskow did not show up. When she so advised the Administration, Plaintiff maintains that a woman said they would "find out what happened and . . . will get back" but never did. *Doc. 16-2* at 2.

Just prior to the November 2007 hearing before ALJ Mark R. Dawson, Dr. Miller wrote another "To Whom It May Concern" letter to the Administration, stating in pertinent part that "Ms. DeLeon suffers from neck and low back pain and shoulder pains. She is unable to lift or stand long and has been unable to work." *Record* at 400. Plaintiff's then-attorney also submitted a letter to ALJ Dawson that enclosed additional documents concerning her work history and physical condition. *See id.* at 140-42. At the hearing, Plaintiff testified that she was depressed because of her physical condition and inability to work. *See id.* at 47-48, 65. However, she did

not mention, and neither the ALJ nor her attorney inquired, about her failure to attend the consulting mental examination.  *See id.* at 28-71.

ALJ Dawson found that Plaintiff's depression was "no more than 'mild'" and therefore not "severe" at Step 2.  *Record* at 19.  Nevertheless, his residual functional capacity analysis and limitations did include depression and a nonexertional component.  He found that Plaintiff had the residual functional capacity to perform "light work with no overhead reaching with the right upper extremity and with less than moderate limitations in the functional area of concentration, persistence, or pace."  *Id.* at 23.  With the aid of the testimony from a vocational expert, the ALJ identified two jobs Plaintiff could perform with these limitations – furniture rental clerk (represented by 760 regionally and 20,000 jobs nationally) and photo counter clerk (4,000 and 30,000 jobs, respectively).  *Id.* at 24.  Thus, he denied benefits, finding Plaintiff not disabled at Step 5 under the framework of Medical-Vocational Rule 202.21.  *Id.*

The Appeals Council declined review on November 10, 2008, thereby rendering the ALJ's decision final.  *Id.* at 3.  In doing so, it "considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council," *id.,* which included two letters from Plaintiff's newly-appointed attorney, medical records from St. Vincent Regional Spine Center from July to August 2008 where Plaintiff had multiple CT and MRI scans, and Dr. Miller's letter from just before the ALJ hearing, *id.* at 6; *see also id.* at 397-406.

## II.  Standard Of Review

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and Plaintiff is not entitled to relief.  *E.g., Hackett v.*

7

*Barnhart,* 395 F.3d 1168, 1172 (10th Cir. 2005).  A deficiency in either area is independent

grounds for relief.  *E.g., Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004).  "Substantial

evidence is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.  It requires more than a scintilla, but less than a preponderance."  *Lax v. Astrue,* 489

F.3d 1080, 1084 (10th Cir. 2007) (citing *Grogan v. Barnhart,* 399 F.3d 1257, 1261 (10th Cir.

2005)).  Put another way, an ALJ's decision is not based on substantial evidence "'if it is

overwhelmed by other evidence in the record.'"  *Wall v. Astrue,* 561 F.3d 1048, 1052 (10th Cir.

2009) (quoting *Grogan,* 399 F.3d at 1261-62).

My assessment is based on a "meticulous" review of the entire record, where I can neither

reweigh the evidence nor substitute my judgment for that of the agency.  *See, e.g., id.*; *Flaherty v.

Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007).

### III.  Analysis

### A.  *Procedural Issues*

Plaintiff makes two arguments based on the Administration's  "Hearings, Appeals and

Litigation Law Manual" or "HALLEX."  The first is that because there is some evidence in the

record of a prior denial, ALJ Dawson should have been aware of that fact and, consistent with

the directives of HALLEX section I-2-0-1, made a decision whether the prior denial should have

been reopened.  *Doc. 16* at 4-5.[4]  Plaintiff also argues that ALJ Dawson should have attached an

---

[4]  The parties have diametrically different views of when a prior application was decided.  I need not resolve this factual dispute in light of the above recommendation, but note that the record before me does not entirely support either position.

Plaintiff asserts that the Administration previously denied her benefits in May 2005, some six months before she filed her most recent application that is the subject of this appeal.  *See Doc. 16* at 4.  In support she cites the portion of the record where she was interviewed at the intake counter and she

exhibit list to his decision pursuant to HALLEX section I-2-1-20 and that failure to do so is a

violation of due process.  *See id.* at 13-14.

In a decision I issued earlier this year, I addressed such a claim and noted that

the Supreme Court, Tenth Circuit, and this District have not decided whether
HALLEX provisions are binding on federal courts or whether a violation of
HALLEX constitutes a violation of procedural due process.  *See, e.g., Gallegos v.
Barnhart,* CIV 02-1270 RLP (10/20/03 MOO, *Doc. 19* at 12-13); *Vigil v. Halter,*
CIV 00-472 MV/RLP (PF&R dated 1/3/01, *Doc. 11* at 5, n.5).  Other courts fall
into two lines of cases – the *Moore* and *Newton* line of cases.  *See Moore v. Apfel,*
216 F.3d 864, 868-69 (9th Cir. 2000); *Newton v. Apfel,* 209 F.3d 448, 459 (5th Cir.
2000).

---

reported to the intake clerk that "she had filed a hearing and was unable to attend since this is when she
was in an auto accident."  *Record* at 156.  She also cites the "intake technical review" form that indicates
there was a "prior decision (DDSQ/3367)" on "052405" at the "hrg" level, but that the prior file was not
attached."  *Id.* at 183.  In contrast, the Commissioner asserts that the prior denial for an SSI application
was years earlier – in July 2002 and denied at the initial level in May 2003.  *See Doc. 17* at 6.

The Commissioner cites a portion of the coded computer print outs that are typically found in
these cases.  *See Doc. 17* at 6 (citing Record at 128).  However, the particular page cited by the
Commissioner is indecipherable and provides little guidance.  *Id.* at 128.  Also, page 155 of the
Administrative Record indicates that the "[d]ate of the prior termination" from the "05/25/2005 hearing"
was "10/2005."  This indicates to me that Plaintiff's prior proceeding may have involved a request to
reopen or an appeal of some sort.  *Record* at 155.  A search of this Court's records, however, reveals that
the instant matter is the only suit Plaintiff has filed.  Res judicata would bar this Court from hearing an
unappealed denial of disability benefits, nor does this Court have jurisdiction to review a denial or refusal
to reopen a claim for disability benefits absent a colorable constitutional claim.  None is  present here.  *See,
e.g.,* 20 C.F.R. § 903(l) (decisions "[d]enying your request to reopen a determination or a decision" are not
subject to judicial review); *Rosenbarker v. Barnhart,* 42 Fed. App'x 270, 271 (10th Cir. 2002) ("Because a
decision not to reopen a case is not a final decision of the Commissioner made after a hearing, it is not
reviewable by federal courts.  *See Califano v. Sanders,* 430 U.S. 99, 108 (1977).  This bar to review exists
"whether or not the [Commissioner] held a hearing on whether good cause for the late filing was shown."
*Dozier v. Bowen,* 891 F.2d 769, 771 (10th Cir. 1989) (quotation omitted).  The only exception to this bar
on judicial review is when the refusal to reopen is challenged on constitutional grounds, an instance the
Supreme Court has described as "rare."  *See Califano,* 430 U.S. at 109."); *Hunter v. Astrue,* 2009 WL
1040126 at *1 (10th Cir. 2009) ("Hunter had previously applied for disability insurance benefits, which
application was denied on May 18, 2000.  Hunter did not appeal that denial, and therefore res judicata
prohibits reexamination of that final decision.  *See Brown v. Sullivan,* 912 F.2d 1194, 1196 (10th Cir. 1990)
(stating that courts have no "jurisdiction to review the [Commissioner's] refusal to reopen a claim for
disability benefits or determination [that] such claim is res judicata").  Thus, aside from the factual dispute,
under the circumstances of this case, there is no legal basis for entertaining a claim based on a decision not
to reopen.

The *Moore* line of cases stems from Ninth Circuit decisions that hold the provisions in internal Administration manuals, such as HALLEX and POMS, are not binding and do not create enforceable rights. That holding ends any further inquiry into the merits of a due process claim. "[I]nternal agency documents such as these [HALLEX and Teletype provisions] do not carry the force of law and are not binding upon the agency. . . . Therefore, they do not create judicially enforceable duties, and we will not review allegations of noncompliance with their provisions." *Parra v. Astrue,* 481 F.3d 742, 749 (9th Cir. 2007), *cert. denied,* 128 S. Ct. 1068 (2008).

*Jimenez v. Astrue,* CIV 08-0817 (Doc. 18 at 17-18) (dismissing claim premised on the ALJ's failure to follow HALLEX provisions). There, I discussed at length why I thought it likely that the Tenth Circuit would adopt the *Moore* view. Plaintiff does not cite, nor have I found, any binding authority that would cause me to reconsider my earlier view. I therefore incorporate the entire discussion in *Jimenez* as my reasoning here, and recommend that the claims based on HALLEX be denied.

### B. Credibility

Plaintiff argues that ALJ Dawson's credibility determination was erroneous for three reasons. Beginning with the last argument, Plaintiff asserts that the ALJ's reliance on the fact that Plaintiff did not "require[] frequent emergency department visits for pain nor . . . hospitaliz[ation]" is contrary to law, because absence of hospitalization is irrelevant. *Doc. 16* at 12-13 & n.12 (citing *Caldwell v. Sullivan,* 736 F. Supp. 1076, 1082 (D. Kan. 1990), *McGee v. Bowen,* 647 F. Supp. 1238, 1251 (N.D. Ill. 1986), and *Rivera v. Schweiker,* 560 F. Supp. 1091, 1097 (S.D.N.Y. 1982)).

Plaintiff also contends that ALJ Dawson cited as inconsistent testimony Plaintiff's statements both that she "watches television, and that 'she had not watched television for two and one-half years.'" *Id.* at 11 (quoting *Record* at 22). In fact her actual testimony reflects that

she was unable to watch a movie from beginning to end during that period.  *See id.* at 11-12

(citing testimony at *Record* at 57).

Finally, she asserts that the ALJ characterized her treatment as "conservative" despite the

fact that she used "strong pain-killers" and steroid injections.  *Doc. 16* at 12.  Plaintiff maintains

that these treatments lend credence to her complaints of pain.  *Id.* (citing "factor number 4" of

Social Security Ruling 96-7p and *Hamlin v. Barnhart,* 365 F.3d 1208, 1221-22 (10th Cir. 2004) for

the proposition that "use of various narcotic and non-narcotic medications, even though partially

effective, does not undermine credibility of pain allegations.").

I do not find any of these arguments or authorities persuasive.

1.  The ALJ Applied The Correct Legal Standards.

There is no dispute that ALJ Dawson identified the correct overarching legal standards

for evaluating whether Plaintiff's complaints of disabling pain were credible.  *See Record* at 20-21.

In particular, he cited 20 C.F.R. §§ 416.972 and 416.929, which govern evaluating medical

opinions and pain and Social Security Ruling 96-7p, which governs assessing credibility.

Specifically, in assessing pain the Administration considers "all of the available evidence,

including your history, the signs and laboratory findings, and statements from you, your treating

or nontreating source, or other persons about how your symptoms affect you.  We also consider

medical opinions . . . as explained in §416.927."  20 C.F.R. 416.972(c).

As explained in more detail in Ruling 96-7p, "[o]ne strong indication of the credibility of

an individual's statements is their consistency, both internally and with other information in the

case record," "[p]ersistent attempts by the individual to obtain relief of pain or other symptoms . .

. may be a strong indication that the symptoms are a source of distress to the individual and

generally lend support to an individual's allegations of intense and persistent symptoms," and

"[o]ther sources . . . may provide information about the seven factors listed in the regulations."

*Social Security Ruling 96-7p* at ** 6-8.  Those seven factors are:

1.  The individual's daily activities;
2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3.  Factors that precipitate and aggravate the symptoms;
4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6.  Any measures other than treatment the individual uses or has used to relieve pain . . .; and
7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Madron v. Astrue,* 311 Fed. App'x 170, 176-77, n.5 (10th Cir. 2009).

        None of the cases cited by Plaintiff hold that the absence of hospitalization is legally

irrelevant to a credibility inquiry.  Indeed, Factor 5 – "[t]reatment . . . other than medication" –

expressly does make hospitalization relevant.  Moreover, none of the cases are factually similar or

lead me to conclude that noting lack of hospitalization along with a myriad of other factors in a

credibility determination is erroneous.

        *Caldwell* involved a claimant who suffered from brain damage that the consulting

examining psychologist found resulted in "difficulty thinking, memory problems, and hand

coordination deficits" and his personality testing revealed "hysterical and hypochondriacal

tendencies, in addition to suggesting the possibility of neurological problems."  736 F. Supp. at

1078-79.  A consulting examining psychiatrist found that combination of the claimant's brain

damage and physical impairments were interrelated and resulted in the claimant's "inability to

think clearly, act responsibly, or function with adequate judgment." *Id.* at 1079.  The reviewing

court believed that the ALJ was biased against the claimant:

> the ALJ demonstrated a shocking distrust of the plaintiff and her
> motivations.  Apparently, because the plaintiff was not a wealthy
> woman, her credibility was subject to a high level of scrutiny.  The
> ALJ, in essence, accused the plaintiff of being lazy and interested
> only in receiving the maximum public assistance benefits possible.
> This attitude is not only extremely distasteful, but it is legally
> insupportable.  An ALJ is required to be fair and impartial, not
> prejudiced against a claimant because of the claimant's financial
> status.  *See* 20 C.F.R. § 404.940 ("An administrative law judge
> shall not conduct a hearing if he or she is prejudiced or partial with
> respect to any party or has any interest in the matter pending for
> decision.").

*Id.* at 1081.  It also found several reasons why the ALJ's rejection of the findings of the examining

sources as to the claimant's mental abilities was not supported by substantial evidence.

> The ALJ cited the lack of psychiatric hospitalization,
> psychotherapy, or other treatment for emotional problems as
> evidence that plaintiff did not suffer any mental impairments.  The
> ALJ also relied on the fact that plaintiff's treating physician, Dr.
> Bloom, made no indication in his notes of mental impairments. . . .
> Neither of these cited reasons support the ALJ's decision. A person
> suffering from mental difficulties may be unable to recognize the
> need to seek treatment.  The fact that a claimant's problems were
> not diagnosed sooner is often because the claimant was unaware of
> the cause of her difficulties. . . .  The fact that a treating physician
> failed to note any mental problems does not contradict the findings
> of a psychiatrist or psychologist.

*Id.* at 1082 (citations omitted).

The discussion cited in *McGee* deals with psychotic symptoms and the ALJ's confusion of

the duration and severity requirements – "A mental impairment which manifests itself from time

to time over a long-term period satisfies [the 12-month duration] requirement. . . .  Evidence

that a mentally impaired claimant has periods of remission from symptoms is relevant to the

severity of the impairment, but does not of itself determine how long the impairment is likely to last."  647 F. Supp. 1238, 1251 (internal quotations and citations omitted).

*Rivera* deals with the ALJ's finding of no functional limitations despite a "moderately severe" to "poor" prognosis by consulting and treating physicians for a patient who was serially hospitalized for serious psychiatric episodes including schizophrenia.  In finding that the ALJ erred, the court noted that the Secretary:

> contends that the ALJ's reference to plaintiff's discharge and present out-patient status illustrates Rivera's significant improvement and the absence of any disability.  The Secretary also highlights the record to demonstrate that following a course of drug/shock therapy and/or psychotherapy after each of plaintiff's many hospitalizations, he was released "improved," "not psychotic," "well oriented with a good memory and of average intelligence," and "he was well oriented in three spheres."

> The ALJ and the Secretary fail to see a consistent and serious pattern of psychological disease because of their overemphasis on Rivera's periodic improvement. Plaintiff has been repeatedly institutionalized between the years 1967 and 1978. While Rivera may have been released in an improved condition from each hospital, it is clear that release from an institution does not in and of itself establish that an impairment no longer exists. . . . Because mental disorders are typically deeply rooted in an individual's personality, years of therapy are often necessary before these conflicts are uncovered and subsequently resolved.  During this course of treatment, it is not uncommon for a patient with a diagnosed mental disorder to exhibit alternating signs of improvement and regression while still retaining the underlying mental disorder.

560 F. Supp. at 1097 (internal citation omitted).

Accordingly, I reject Plaintiff's third basis for alleged error.

2.  The ALJ's Credibility Finding Is Supported By Substantial Evidence

"Credibility determinations are peculiarly the province of the finder of fact, and [the

Court] will not upset such determinations when supported by substantial evidence." *Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995) (quotation omitted).  Boilerplate language is insufficient.  *E.g., id.; see also, e.g., Carpenter v. Astrue,* 537 F.3d 1264, 1266-70 (10th Cir. 2008); *Hardman v. Barnhart,* 362 F.3d 676, 679 (10th Cir. 2004).  Instead, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Kepler,* 68 F.3d at 391 (internal quotation marks and brackets omitted).  However, the Tenth Circuit does not "reduce[] credibility evaluations to formulaic expressions" and it "'does not require a formalistic factor-by-factor recitation of the evidence.  So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied.'"  *White v. Barnhart,* 287 F.3d 903, 909 (10th Cir. 2001) (quoting *Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir. 2000)).

ALJ Dawson's residual functional capacity and credibility discussion was particularly thorough.  First, he accurately summarized what Plaintiff claimed to be her pain and the limitations caused by it:  she is able to sleep only five hours a night, unable to lift a gallon of milk because of loss of strength in her right arm, has numbness in her fingers, experiences migraine headaches twice a month, headaches every other day, and is depressed over her limitations. *Record* at 21.

> [H]er day is spent having coffee, sitting down and watching the television news, and reclining.  Her daughter comes over to help her with such tasks as bathing, with her hair, tying shoes, and vacuuming.  She has problems with moving her right arm, especially to the back . . . she does a little laundry, microwaves food, and dusts with her left hand.  She cannot cook a full meal because she cannot lift the pans.  She lifts a gallon of milk with her left hand as assisted by her right.  She does some reading, some television watching, and listens to the radio.  She has problems

15

with reading as she does not always understand or forgets what she reads. She misplaces things often. Sitting causes pain through her arm and neck, so while watching television she must get up to relieve her discomfort. She can stand for a while and then must sit down.

. . . she gets along with people but . . . is sad and depressed because she cannot work, cannot do the jobs she used to do, and is lonely. She does not drive because she must do everything with her left arm and she feels driving is a safety risk. She is able to pick up papers or a pencil, but if she used her hand repetitively such as when writing she would feel a tingling sensation.

*Id.* at 21; *see also id.* at 50-63, 159-74.

His credibility analysis focused on the lack of supporting objective medical evidence or medical opinion that Plaintiff's pain or other limitations in her right arm precluded all work, touching on several of the seven factors. In relevant part, that discussion provided:

the objective evidence shows no significant abnormalities of the shoulder or elbow . . . some early desiccation of cervical discs causing some slight narrowing and bulging at two levels with some mild to marked neural foraminal narrowing, but no evidence of herniation, spinal stenosis, or cord compression. [Although there were early notes of] tenderness and limited range of motion . . . [a]n orthopedic evaluation in April 2006 showed . . . sensation was intact and . . . it was difficult to localize exactly the etiology of the claimant's pain. [By] August 31, 2006 [claimant had an] evaluation at the emergency department [that] was within normal limits . . . full range of motion of the extremities without pain . . . only a small amount of soft tissue swelling . . . [and a notation] that the claimant was able to perform all activities of daily living independently and without assistance.

The claimant's allegations of severely restricted activities of daily living because of pain are not supported by the record. The claimant testified that she gets about five hours of sleep because of pain. However, she was not prescribed a medication to help her sleep. As of August 2006 she was able to perform activities of daily living independently without assistance (Exhibit 1F/207). The evidence does not show significant problems with her wrist or hand

16

or greatly diminished strength in the right upper extremity that would support her testimony of dropping things and having difficulty lifting things. She testified that she was barely able to lift a gallon of milk with her left hand, although there is no medical evidence to support problems on her left side. She testified that she uses her right hand to assist her left. The record does not support her testimony that she has frequent headaches or that she is forgetful. Testimony was also inconsistent. For example, the claimant indicated that she watches the television news and could watch a program of one-half hour before her eyes would blur and her back would hurt. Later, she testified that she had not watched television for two and one-half years.

The claimant has been treated quite conservatively for her musculoskeletal pain with medications such as Tylenol with Codeine, Lortab, Hydrocodone, and ibruprofen (sic), occasional steroid injections, and some physical therapy. She has not required frequent emergency department visits for pain nor has she been hospitalized. She is not a candidate for surgery. It appears that pain management did not continue past mid-2005. Treatment has not escalated. The most recent medical record is dated March 8, 2007 and does not contain clinical findings (Exhibit 1F/211). Although there has not been complete resolution of pain with treatment, relief was obtained. The claimant alleges sadness and depression because of the change in her life situation, but she is not involved in formal treatment and is only treated with medication by Dr. Miller, her primary care physician. The claimant failed to appear for two mental consultative examinations and thus, the State agency did not find evidence to support a mental impairment (exhibit 1F/139 and 151).

Dr. Miller noted in December 2005 that the claimant had been and continued to be unable to work due to shoulder problems (Exhibit 1F/194). The claimant testified at the hearing that he had not cleared her to return to work. Yet, as noted above, Dr. Conescu, an orthopedic/pain specialist, advised in June 2005 that the claimant could work light duty with limited use of the upper right extremity (Exhibit 1F/31). And, although a December 17, 2006 note from Dr. Miller (the last of record from this treating source) indicated that the claimant's shoulder pain was ". . . . disabling for any work requiring the use of her right arm," it also indicated that her pain was (sic) "was of unclear etiology" and did not preclude the claimant from performing all work.

17

[Paragraph summarizing agency medical source finding that Plaintiff is capable of light work with certain restrictions.]

Drs. Conescu and Miller found that the claimant could perform work with limited use of her right arm.  The State agency source found the claimant to be similarly restricted.  Given that the opinions are consistent with the evidence at the time they were provided, that is June 2005, February 2006, and December 2006, the Administrative Law Judge accords them considerable weight. . . However, the claimant has received little treatment since those assessments and medical records do not demonstrate significant worsening of her conditions.

*Record* at 22-23.

I disagree with Plaintiff that citing use of narcotics and steroids while calling the treatment "conservative" is inconsistent and somehow undermine Plaintiff's credibility.  First, the ALJ exclusively or primarily relied on his "conservative" therapy finding instead of the many other factors he relied upon in his credibility decision.  *See Harjo v. Astrue,* 2009 WL 1927486 at * 3 (10th Cir. 2009) ("It is clear in this case that the ALJ's decision was not based solely, or even primarily, on Ms. Harjo's failure to produce a physician's recommendation that she be restricted from working.  Such a narrow construction of his opinion is simply not supportable when read in its entirety.").  Moreover, in context, the ALJ plainly meant to contrast "conservative" treatment of medications and physical therapy with more "intensive" or "invasive" treatment such as surgery.  The record wholly supports the import of the discussion in that paragraph – that Plaintiff's complaints, degree of strength, range of motion, and the treatment she received for both her elbow and shoulder, both pre- and post- car accident, remained static.  *See, e.g., id.* at 195, 211, 208,  203, 324.  An April 2006 medical record from the Orthopedic and Rehabilitation Clinic of University Hospital found:

18

> Certainly she had positive impingement signs here, although she
> had pain with pretty much every maneuver we did.  Her symptoms
> are somewhat consistent with subacromial impingement, although
> she is somewhat allodynic, and it is difficult to localize exactly the
> etiology of her pain.
>
> * * * * *
>
> . . . As of right now, we do not have a clear diagnosis, and
> we certainly would not want to proceed with a surgical
> intervention given the lack of clarification at this point.  We would
> like to see her back in six weeks.  We did give her a prescription for
> physical therapy.  We will see how she did with her injection, with
> physical therapy.  If her symptoms have coalesced to a more
> discreet clinical diagnosis, we will certainly consider further
> treatment at that point.

*Id.* at 191-92.

There are no records showing that Plaintiff returned to the clinic or pursued physical therapy.  Instead, she saw Dr. Miller for her prescription medication and injections, and the Alta Vista Hospital for x-rays and CT scans of her brain, chest, spine, wrist, elbow, and nasal bones, which were unchanged or normal.  *See, e.g., id.* at 185-90, 213-19, 225-29, 231-32.  In March 2007 she was seen once by neurologist Dr. Wendy Dimmette, who recommended further evaluation for Plaintiff's complaints of pain.  *Id.* at 184.  There are no more medical records in the file other than those from two years after the Dr. Dimmette visit, when Plaintiff was seen at the St. Vincent Spine Center.  The Center conducted a "whole body bone scan" as well as more MRI's and CT scans of Plaintiff's thoracic spine, cervical spine, lumbar spine, and head, all of which where "normal" or "unremarkable" or showed "minimal" conditions.  *See id.* at 401-06.

Similarly, I disagree with both Plaintiff's *and* the ALJ's interpretation of Plaintiff's testimony about sitting and watching television or a movie as both understated and overstated. As I read the entirety of that testimony, Plaintiff testified that before her injury she was able to sit

19

and watch televison or a movie for extended periods of time, but afterward she could not because her back hurts, the pain in her arm shoots up to her neck, her eyesight is troublesome and she gets a headache.  Therefore, she has to move around frequently and she turns off the television. *See Record* at 56-57.

I find that, in context, citing a mistaken example of inconsistent testimony does not undermine the legitimate and unchallenged reasons given for the credibility decision.  *See Roybal v. Astrue*, 224 Fed. App'x 843, 848 (10th Cir. 2007) ("The ALJ cited several reasons to discount Ms. Roybal's credibility. . . .  we acknowledge that the ALJ may have erred in finding that Ms. Roybal's testimony about her inability to help her friend to the hospital was inconsistent with her other activities.  Any such error in this case does not justify reversal, however, because the ALJ's other reasons for discounting Ms. Roybal's credibility are supported by substantial evidence.").  Thus, ALJ Dawson's credibility decision is supported by substantial evidence.

### C.  Findings as to the Extent of Physical Limitations

As Plaintiff notes, light work requires the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b); *see also Doc. 16* at 11.  As for physical abilities, ALJ Dawson concluded that Plaintiff has the residual functional capacity to engage in "light work with no overhead reaching with the right upper extremity."  *Record* at 23.  In her motion, Plaintiff asserts that she cannot perform <u>any</u> work with her right arm and that absolute limitation is "overwhelmingly" supported by the medical evidence and Dr. Miller's December 2006 opinion.  *Doc. 16* at 9 (citing *Record* at 186 – "the medical evidence overwhelmingly supports the conclusion of [Dr.] Miller . . . that Ms. DeLeon's right shoulder pain <u>precludes</u> her from using her right arm.") (emphasis added).

20

I disagree.  In support of the "overwhelming" medical evidence, Plaintiff cites selectively from the medical evidence.  She ignores Dr. Conescu's opinions given for Worker's Compensation benefits purposes that Plaintiff could work at a light and sedentary level and the other evidence discussed above that showed no change of import in her symptoms or tests over time.

Also, Dr. Miller rendered three "opinions" and, I have read them together, in context and yet liberally to discern the actual functional limitations he meant to describe.  In so doing, Dr. Miller believed that Plaintiff's shoulder pain (for which the doctors had no explanation as to the cause) precluded her from using her right arm because she was "unable to lift" with it.  *See Record* at 158, 186, 400.[5]

Moreover, Plaintiff did not testify that she has complete inability to use her right arm and hand.  In response to a question about how her elbow injury kept her from working, she said, "I won't be able to do any heavy lifting or anything, stuff like that, in any job."  *Id.* at 42.  She testified that her dominant right hand loses strength such that when she "picked up a gallon of milk, and not ever from here to the TV room, it fell on me. . . .  My, my fingers get numb."  *Id.* at 43.  Her right hand is not wholly nonfunctioning, however.  She testified that she can take notes

---

[5]  In his December 2006 letter to Plaintiff's representative at the time – the one Plaintiff relies upon – Dr. Miller summarized the findings of other physicians, and concluded:  "In short, she has shoulder pain with limited range of motion, of unclear etiology.  This is disabling for any work requiring use of her right arm.  *Record* at 186.  A few days later, he filled out a form for the New Mexico Department of Human Services Income Support Division stating that the "limitations placed on patient [were that she] cannot use right arm."  *Id.* at 158.  In September 2007, he was of the opinion that Plaintiff is "unable to lift."  *Id.* at 400.  To the extent he did not describe a functional limitation, these documents are not "medical opinions."  To the extent that they can be read to say Dr. Miller was of the "medical opinion" that Plaintiff is "disabled," they are entitled to no weight because that ultimate conclusion is reserved for the Commissioner.  *See, e.g., Cowan v. Astrue,* 552 F.3d 1182, 1189(10th Cir. 2008); 20 C.F.R. § 404.1527(a)(2).

slowly, pick up papers and pencils "over and over again," but not for as long as an hour.  *Id.* at

63-64. She demonstrated that she can raise her right hand to her face but could not reach the

back of the top of her head.  Plaintiff further testified that she does "everything" with her left

hand, such as dusting, doing laundry, frying an egg, using the microwave, carrying a gallon of

milk, opening bags and containers, assembling sandwiches.  *Id.* at 49, 51-53, 58.

Indeed, the ability to use only one arm is not automatically disabling.

> Dr. Hood's assessment is not inconsistent with the ALJ's
> conclusion that Evans could perform sedentary work. Even the
> complete loss of the ability to use one arm does not automatically
> render a claimant disabled.  *See Robinson v. Celebrezze,* 326 F.2d
> 840, 841 (5th Cir. 1964) (citations and quotations omitted) ("it is
> common knowledge that a man with only one arm or leg, if not
> otherwise incapacitated, may do much valuable work and engage
> in many gainful occupations"); *see also Carey v. Apfel,* 230 F.3d
> 131, 147 (5th Cir. 2000) (ALJ correctly determined that amputee
> could perform light work); 20 C.F.R. § 404.1567(a) (the
> regulations do not indicate that sedentary work would require the
> use of both arms).

*Evans v. Astrue,* 2008 WL 4393780 at * 3 (N.D. Tex. 2008).  And, of course, the regulations

provide that "[i]f someone can do light work, we determine that he or she can also do sedentary

work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for

long periods of time," neither of which are argued or supportable here.  20 C.F.R. § 404.1567(b).

### D.  Failure to Include the Found Nonexertional Impairment in Questions to the Vocational Expert Requires Remand

ALJ Dawson included a nonexertional component in his residual functional capacity

finding – "less than moderate limitations in the functional area of concentration, persistence, or

pace."  *Record* at 23.  I find the parties' arguments and the ALJ's decision in this area

disconnected from the actual proceedings.

For example, Plaintiff contends that ALJ Dawson's characterization is "too vague to be useful" because it referred to "occasional" and "this court is left to guess how often 'occasional' occurs, and what exactly the ALJ meant by 'a work impairment.'"  *Doc. 16* at 8-9.  However, the ALJ made no reference to any "occasional" qualification in either his residual functional capacity decision or in his question to the vocational expert.  *See Record* at 20, 23, 68.[6]

Also, unlike the Commissioner, I do not read Plaintiff's arguments as challenging the ALJ's Step 2 severity determination concerning Plaintiff's depression.  *See Doc. 17* at 7-12.  To the extent the Commissioner is suggesting that a lack of severity eliminates the need to consider the effect of Plaintiff's depression, I disagree.  Here, the ALJ in fact considered depression at Step 4, and I will not disturb that decision to engage in an alternative analysis under the facts of this case.  *See Record* at 18-19.

There was an evident misunderstanding about a scheduled consultative mental examination, and both the Administration and Plaintiff's first attorney failed to rectify that omission before the ALJ hearing.  As a result, ALJ Dawson was faced with sparse mental health medical records, but ones that rated Plaintiff at a  GAF of 45 and 47 in 2003 and 2004.  As Plaintiff notes, a "GAF score of 41-50 indicates [s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning, such as inability to keep a job." *Pisciotta v. Astrue,* 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (internal quotations omitted); *see also Langley v. Barnhart, 373* F.3d 1116, 1123 n.3 (10th Cir. 2004) (quoting American Psychiatric Association,

---

[6]  I thought Plaintiff's citation to the word "occasional" may have been a direct quote from the *Langley v. Barnhart* decision relied upon by Plaintiff, *see Doc. 16* at 9, but it is not, *see* 373 F.3d 1116 (10th Cir. 2004).

Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 34)).  This
is not evidence that ALJ Dawson could have "simply ignore[d]."  *Simien v. Astrue,* 2007 WL
1847205 at *  (10th Cir. 2007) (citing *Clifton v. Chater,* 79 F.3d 1007, 1010 (10th Cir. 1996)).

 Plaintiff was discharged from mental health treatment because she failed to show for
appointments and was not taking her medication as prescribed.  The only mental health
treatment with which she complied was taking antidepressant medications prescribed by Dr.
Miller.  Plaintiff did not attribute her forgetfulness to depression - quite the opposite.  She
instead testified that the depression was the result of her physical limitations and pain and
inability to work and do things she enjoys.  *See, e.g., id.* at 60-61, 65.  Nevertheless, she also
testified that:  she has problems reading because "I forgot what sentence I was reading," *id.* at 54;
she has been "suffering the migraine headaches and that, but I forget stuff. . . a paper, where I put
it . . . I don't find it until two or three days later . . . I like misplace stuff sometimes . . . my
memory," *id.;* she "misplaced my paper for the hearing . . . couldn't even find where I put it,"
which made her "disappointed, and depressed, and sad," *id.* at 60; and she has misplaced the key
to her medical cabinet and paperwork and when she goes to find things that she thought she
placed somewhere they are "not there.  So, I don't even know.  I have like problems and
craziness," *id.*  Having virtually no current information in the record concerning Plaintiff's mental
limitations, ALJ Dawson obviously credited Plaintiff's testimony about her forgetfulness.

 Plaintiff argues that ALJ Dawson omitted this nonexertional impairment in the
hypothetical question to the vocational expert ("VE").  That is not the case – he did so in fact by
supplementing his original question.  The ALJ first asked the VE which jobs Plaintiff could
perform given the physical limitations listed in his residual functional capacity finding and she

24

found three - hostess, furniture rental clerk, and photo counter clerk.  *See Record* at 68.  He then

asked:  "Now, if I were to additionally find that the claimant has a work impairment in the ability

to concentrate, persist, and stay on task due to chronic headaches and a pain issue, I would

assume . . . a different answer?"  The VE replied in the affirmative, "That would eliminate all

work."  *Id.*

Plaintiff's point is that the ALJ found the nonexertional impairment to be part of his

residual functional capacity finding, but then issued a decision ignoring the VE's testimony that

this limitation would preclude all work.  *See Doc. 16* at 8.  Indeed, that is what happened – there

is a disconnect between the ALJ's stated residual functional capacity finding in his decision

including the nonexertional impairment and the two jobs he found Plaintiff could perform based

on the VE's testimony that would have been eliminated given the nonexertional impairment.[7]

I cannot explain the discrepancy in the opinion.  *See Record* at 24.  Ordinarily, a mere

deficiency in opinion writing would not be grounds to remand,[8]  But to uphold ALJ Dawson's

---

[7]  ALJ Dawson used the furniture rental clerk and photo counter clerk positions, and evidently disregarded the hostess position based on counsel's questioning at the hearing.  *See Record* at 24, 70-71.

[8]  *E.g., Ruybal v. Astrue,* CIV 07-1060 KBM (Doc. 23 at 18 – "That the ALJ could have been much more comprehensive in her discussion is not a basis for reversing the decision. . . . *see also, e.g., Draper v. Barnhart,* 425 F.3d 1127, 1130 (8th Cir. 2005) ("'deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case'") (quoting *Reeder v. Apfel,* 214 F.3d 984, 988 (8th Cir. 2000)); *c.f., Wall v. Astrue,* 561 F.3d 1048, 1069 (10th Cir. 2009) ("we have previously rejected "a construction of *Clifton* that, based on a reading of the ALJ's decision as a whole, would lead to unwarranted remands needlessly prolonging administrative proceedings."  *Fischer-Ross,* 431 F.3d at 730.  Here, a remand would serve no other purpose than to needlessly prolong a protracted course of proceedings, which has already spanned over seven years."); *Harjo v. Astrue,* 2009 WL 1927486 at * 2 (10th Cir. 2009) ("We agree that the ALJ's analysis was somewhat lacking.  He could have done a better job of tying his impressions of Ms. Harjo's testimony to contrary or supporting evidence in the record. . . .  And we have consistently urged ALJs to do so in order to make our review meaningful. . . .  But we also agree with the district court that the ALJ's manner of addressing Ms. Harjo's complaints was effective").

decision, I would have to engage in impermissible substitution of my judgment for that of the agency.

Wherefore,

IT IS HEREBY RECOMMENDED that Plaintiff's motion to remand be granted in part, and that the matter be remanded to the Commissioner for further proceedings concerning Plaintiff's mental impairment only.

THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.

_____
UNITED STATES MAGISTRATE JUDGE